All right, Mr. Biddle, I believe you are going first, please. Thank you, Your Honor. Good morning. I'm appearing as counsel for the Sycuan tribe here in this matter and may it please the court. This case may have looked to the district court judge as a simple case, a case of, hey, there's an arbitration provision here, I can just kick this to arbitration, but it's really a much more complex case and it deals with things like sovereign immunity and federal preemption and, you know, whether the tribe waived its sovereign immunity with regard to all issues that were being sent to arbitration and whether there was a contract formed and the scope of arbitrability and these bigger issues that really should have been decided by the district court. Instead, the district compelled arbitration and judgment and motion for judgment on the pleadings and denied the tribe's counterclaim when the tribe was just trying to figure out what its obligations are. So we've got, let me, I just want to make a few points very clear if I could. Number one, the tribe has always, has passed and is TLRO as required by the gaming compact with the state. There's never been any waiver of that. We're not trying to get out of a contractual obligation with the state. What we're trying to do is comply with federal law, the National Labor Relations Act. And with respect, and I know you have a, you've given us an argument and in your brief, but it seems to me that our case law and Supreme Court case law seems to answer each of the points that you have made. You're not dealing here with a state versus federal regulation. This is a federal law whereby the tribe entered into an agreement with the state, said it was going to do certain things with respect to labor. We have a specific cases that say that the NLRB, NLRA, excuse me, is separate from this statute that governs here. You've got two federal statutes, not a federal and a state statute. You've got Buckeye check cashing. I could go on and on, but the bottom line is, as I read your brief, it seems to me that our existing case law and the fact that it's two distinct federal statutes involved here really answer all these questions. What am I Smith? And first, let me just say, I forgot to say a thing. I would like to reserve two minutes for rebuttal. To answer your question, it is not just two federal statutes here that we're dealing with. What we're dealing with is the TLRO, which was included by the state and mandated by the state to be included in this compact. For Siquon to be able to be, to operate gaming operations, it had to include this TLRO. But it's an essence of state law. It's an essence of state. It did. It's a compact. Correct. Approved by federal officials, right? That's correct. So what federal officials approved in 2015 was the gaming compact between the state and the tribe, and that was before we had the Casino Palma decision in 2018 that questioned whether there's federal preemption with regard to this, the provisions of the TLRO, because the provisions of the TLRO far out distance what the National Labor Relations Act says. So what we're dealing with is a state mandate that is now questioned by federal, by Ninth Circuit and Casino Palma, and then therefore by federal law. And the National Labor Relations Act is more protective to employees' rights than the TLRO, and that's what we're concerned about. Here's what could happen, Judge Smith. If this was to go to arbitration and the tribe said, sure, we'll arbitrate all this. We'll just not think about Casino Palma. We'll not think about NLRB jurisdiction here. We'll just go ahead and arbitrate the issues. We'll do what the TLRO says. That's to give contact information of telephone numbers to the union. Before there's any showing of interest whatsoever by the employees that they're interested in being unionized or having a union election. Counsel, again, I understand your point here, but you read Palma very differently than I do. As a matter of fact, Palma said we have not uncovered any conflict between the NLRA and IGRA. There's no preemption here. So what you're dealing with then is what did the tribe enter into? As I understand it, they agreed to these labor provisions. That was part of the deal. And all the union had to do was to trigger that. And it was certain terms that were all laid out, approved by the tribe, approved by the state, approved by the federal government, and they wouldn't comply. So then we get down to you claim there's no contract. Well, under Buckeye, the Supreme Court says, hey, you know, if there's an arbitration clause in there and you're talking about the whole contract, what do we do? We send it to the arbitrator, right? That's an excellent point about Buckeye check cashing. Let me just make our point about that clear. And that is that Buckeye check cashing says that it's proper for the arbitrator to decide whether a contract is valid, whether a contract of arbitration is valid or the provisions under it. The TLRO arbitration provision in our case just says that the arbitrator can deal with disputes regarding union organizing, elections and collective bargaining. It doesn't talk about and therefore Siquon never waived its tribal, its sovereign immunity with regard to whether it could disregard what we think is applicable federal law under Casino Palma. And the reason we think it's applicable is, you know, and that was in 2015, before the 2018 decision in Casino Palma, because in Casino Palma, the court stated that employees who brought unfair labor practice charges with the National Labor Relations Board had that the NLRB had jurisdiction to hear those. Well, how can that be if everything has to go to arbitration under the TLRO? How can the NLRA or NLRA apply and NLRB have jurisdiction if everything has to be arbitrated under the TLRO? So what the tribe is trying to do, the tribe is not trying to skirt any obligations with regard to the compact or keep a union out or any of those kinds of things. We just want to make sure that we're complying with applicable federal law. And that's why we did a counterclaim for declaratory judgment that the judge, the district court judge ignored and dismissed. That's a very colorful analysis of your position. Thank you, I guess. About your, your kind of your threshold argument, which is that you just never formed the tribe never formed a contract. Maybe. Can you speak to that? Because I do think there's language in the TLRO that supports your your view of things. But I'm curious, I guess, in the ordinary course of things, how does the tribe, quote unquote, accept this offer that the union makes to you? Well, it's a strange situation, because the tribe has never had to accept any offer or deal with the TLRO before because no union has ever come to the tribe and said, here's what we want to do. We're going to file our notice of intent to organize. So we've got issues with regard to contract formation as you're as you're discussing what one can there be? Is it proper for a contract to be offered to just in an open ended way without knowing who the parties are? Number two, and this is sort of key is the if we consider that there's a contract of arbitration in the TLRO, what does that go to? Well, specifically related to the TLRO and specifically in the TLRO, it talks about arbitration with regard to union organizing elections and collective bargaining the processes for those things, how that's going to happen. It doesn't talk about, you know, whether there's federal law that might apply that we have to be worried about as a tribe. You know, the worst worst case scenario is we say no or we excuse me, we say yes. We start bargaining with the union before there's a 30 percent showing of interest. We give them the contact information. We have a hands off approach. You know, we have no free speech in order in terms of the campaign. So we can't educate our employees with regard to unionization and our feelings about it and those kinds of things. Those are the things that are in the TRLO that are different from the NLRA. The NLRA permits employers to talk about things as long as they're not threatening and intimidating and promising and those kinds of things. The NLRA also requires that before an employer has to turn over contact information, private information of employees, that there's at least a 30 percent showing of interest that the employees want to go through the union election process. Those are safeguards for employees. If we as a tribe just agree to disregard those, can an employee then file an unfair labor practice charge against the tribe? Perhaps. We don't want that to happen. We don't want to have to be facing an LRB hearing at the same time as we're dealing with a union election that might or might not be upheld as valid. So that's our concern with that. There's also, you know, the federal court, the district court seemed to say that it felt like it did not have jurisdiction over the counterclaim, the counterclaim for citing Buckeye check cashing again, which is a little disconcerting because, first of all, the Supreme Court in Buckeye certainly didn't say at no time can a court have any jurisdiction over a situation where there might or might not be an arbitration clause that's valid. It certainly said that we prefer, as the federal policy is, we like things to go to arbitration. Arbitration is quick and easy, but there's many problems with that here. One is this is an issue of statewide concern, and it's a pending issue of statewide concern because there's at least six other cases filed right now in California district courts, one that just had oral argument back in December, the Chicken Ranch Rancheria case, where at least ancillarily the issue of the NLRB preemption of the TLRO or some parts of the TLRO were raised. So we've got, if we have an arbitrator decide the federal preemption issue, which is what the district court said the arbitrator could do, we're going to have an arbitration decision that goes whatever way, and how is that going to affect these other six cases that are currently filed and many others that might be coming? That's a concern because we don't want inconsistent, you know, application of the TLRO. And if an arbitrator in our case says one thing, an arbitrator in another case says another thing, then we've got this big jumble that's not helpful to anyone. So I'll reserve the rest of my time if there's no other questions right now. Thank you very well. All right, so Ms. Martin, please proceed. Thank you. Kristen Martin, McCracken-Stammer, Minnesota, representing Unite Here Local 30. May it please the court. This case can be resolved with a straightforward application of Buckeye check cashing. Buckeye check cashing says that an allegedly illegal contract provision makes the contract void, or it might make the contract void, from its very inception. But that does not present the contract from forming. And so the alleged illegality is an issue for the arbitrator to decide, not the court. The tribe here says that some parts of the Tribal Labor Relations Ordinance conflict with the National Labor Relations Act. And that those parts of the TLRO, not the entire TLRO, but those parts of the TLRO are therefore void. Again, that's a Buckeye check cashing problem. It's not a contract formation problem. I'd like to call the court's attention to what the On page 360 of the excerpt of record, in a letter dated November 14, 2019, in the third paragraph, referring to the contract created by Section 7 of the TLRO, the Tribes General Council stated, quote, the so-called bilateral contract would be invalid if the ordinance is preempted. In other words, preemption creates a question of contract validity, not contract formation. And can you address the argument the tribe makes as to contract formation? Because as I indicated, when your opponent was speaking, that to me is the most difficult part of the case for you. And it's really just given the plain language of the TLRO itself. I thought the move you made in your brief was clever to say that, well, the way we should really think about it is that the tribe is the one who made the offer and we, the union, accepted it. But that's So help me understand why you don't think that language is a barrier to your position on contract formation. The tribe does not dispute, either in its brief or as counsel said here today, that the tribe has adopted and maintained the Tribal Labor Relations Ordinance in effect. In fact, it has to say that because it does not want to have a dispute with the state over compliance with the contract. So we have the Tribal Labor Relations Ordinance in effect. And what it says is that, yes, it's phrased in terms of if the union makes an offer, then the tribe will accept it. By maintaining the Tribal Labor Relations Ordinance in effect, the tribe has, by virtue of this language, it says, is, remains in effect, it has Well, but it's the tribe at least says that, well, no, we never did accept. We in fact, our response to you, to your client, was to say, thanks, but no thanks, essentially, right? We're not willing to form this bilateral contract with you. Sorry. What I would say to that Judge Watford is that the tribe can't have it both ways. It can't say we have this Tribal Labor Relations Ordinance effect, which says, we will accept. And then say, oh, but we're not doing that. Because by saying that, the tribe's essentially saying the Tribal Labor Relations Ordinance isn't in effect. Can't have it both ways. Well, it's just, can I, let me put a fine point on it. Tell me if you disagree. Both of those things, it seems to me, could be true. It is in the entire TLRO. But we might well be in breach of our agreement with the state by refusing to take the action, right, the acceptance that we committed to taking in the TLRO. So I'm not sure, I'd like to hear what your opponent has to say on the rebuttal. But why can't both of those things be true? Right? The thing is still in effect. But yes, we might well have breached it in this particular instance by not accepting the union's offer as we promised. I think two points about that. One is the tribe does not want to say, well, we might well be in breach of our compact with the state. We're not in breach because we're doing everything the compact requires us to do. We're adopting and maintaining the TLRO. And the TLRO, while yes, it uses the language of the tribe, will accept the union's offer. It does not say that the tribe has to do anything specific to accept the union's offer. So we would say by maintaining the TLRO, it is accepting the union's offer. That's my answer to your question. Now the tribe uses the term preemption to describe its disagreements with the TLRO or parts of the TLRO. But I would submit that preemption is not really the tribe's complaint. The tribe's complaint is that in this view, some provisions of the TLRO are invalid because the tribe says they violate the NLR. And we'll get to whether they actually do violate the NLR. But that's, what the tribe is raising is saying, well, those parts of the TLRO were invalid under federal law. That's a Buckeye check cap problem. And let me try to explain why they don't violate the NLRA. The NLRA is not a statute that's a part, it doesn't provide procedures that unions and employers must use in any circumstance where it provides procedures that an employer and a union may use. And here the tribe is an employer. But it also says, and it allows, the union and the employer to contract around those procedures. That's in Section 301 of the Labor Management Relations Act, which we've cited in our briefing. We've cited cases, both HVRE versus Merritt Corporation and SEIU versus St. Vincent's Medical, and then a number of cases from other circuits in which unions and employers entered into agreements for the procedures for how unions and employers, the union and the employer would allow employees to organize what rules or the rule they would follow. And so as long as none of those procedures conflict with the NLRA, require something that the NLRA prohibits, the courts say these are valid Section 301 contracts and they're going to be enforced. Let me ask the court to think about each provision of the TLRO that is in dispute between the union and the tribe. These are all principally housed in Section 7 of the TLRO. And that is the section that creates the contract between the union and the tribe. As I said, the NLRA allows unions and employers, and the tribe here is an employer, to agree to procedures for a contract that has procedures that are different than the NLRA. In that contract, the union promises not to strike or picket or create other disruptions to the tribe's business. The NLRA allows such a union. The NLRA doesn't require employers to do that, but the NLRA allows employers to waive the right to oppose unionization. And that's what the tribe did here in this contract, by adopting and maintaining the TLRO. And then there's other things that the tribe promises. And these are all things that the NLRA permits employers to agree to. It agrees to give the names and contact of information of its employees to the union. Can I ask, let's say that there really was a provision of the NLRA that was in direct conflict. And I guess, let's talk about the providing of the personal information of the employees. Let's say that the NLRA was crystal clear that, and I am not a labor expert, so I'm just going to make up stuff and you'll correct me. But let's say if the NLRA said, under no circumstances shall an employer provide that kind of information to the union until some certain threshold set of events has occurred. I think what I hear the tribe saying is that, well, that's how we read the NLRA. And what the TLRO is committing us to do is to provide this personal information to you all before the NLRA trigger has been met. And if we do that, we could well face an unfair labor practices charge or some other charge, not from you, but from the employees. And we don't want to be kind of caught in the middle. So, I mean, maybe you could just respond to that scenario. Well, and I will say it first as a sort of a threshold matter. In absolutely no way does the NLRA say employers may not provide that information. But I'll imagine for the sake of argument that it did. I think the tribe's answer is to go to arbitration and to make that case to the arbitrator. Say this provision of our contract with the union, which says we must provide this law. And therefore, Mr. Arbitrator, don't compel us to comply with that provision. Now, if an employee at the same time then turned around and filed an unfair labor practice charge with the National Labor Relations Board, an employee could do that. You're correct, Your Honor. And the tribe could do one of two things. It could defend and by saying to the NLRB, well, look, we didn't provide it. We argued to the arbitrator that we didn't have to provide it. And here's what the arbitrator said. So we didn't provide it. Or it could also say to the NLRB, NLRB, you should defer to arbitration. And the NLRB has a number of deferral to arbitration documents that invokes in various circumstances. So that might be the outcome of this case. Obviously, it's hypothetical. So it's hard to say how the NLRB would deal with it. But the tribe is not necessarily faced with sort of two competing problems. Can I back up a little bit and just ask you a question for my own information? Is it the NLRB's position that they have jurisdiction over Indian reservation? Yes. Yes, the NLRB took that. And is that confirmed by the case law? Yes, the NLRB took that position in a case around 2004 called San Manuel Band. That was a California tribe with the Tribal Labor Relations Ordinance adopted. That position was enforced by the DC Circuit. And then in a case in several years ago, Casino Palma, which is another California tribe was also with the Tribal Labor Relations Ordinance. The NLRB took the same position, it went up to the Ninth Circuit and the Ninth Circuit enforced the NLRB order. So that's well established at this point. All right. So what this TLRO has established to do that is to invoke the full pathway of NLRB powers, right? Is that right? Well, what it does is it, you know, unions and employers, even in sort of ordinary private sector employers, non-tribal employers can agree with unions about the process for union organizing. That's very, very common. There's Section 301 contracts enforceable in federal court. And that's essentially what the tribe did here. It told the state, we will make a Section 301 contract with the union about the procedures for union organizing. And those Section 301 contracts operate concurrently with the NLRA. And so, you know, although there are provisions in the TLRO that differ from the NLRA, right? There are procedures that are different, but they're not in conflict. There's nothing that the TLRO says, employer or union, you must do, that the NLRA says employer or union, you may not do, it would be illegal to do. There's a lot of open space within the NLRA that allows union employers to decide how they want to operate. For instance, the NLRA says an employer can't be forced to be unionization. But the NLRA also allows employers to waive that. And that's what the tribe did here. Has the tribe alleged that there are specific provisions of the NLRA and the TLRO that are in conflict? The tribe has said that, but the only one that is specifically identified that I can recall off the top of my head is it identified a provision of the NLRA that and it says, well, look, the TLRO doesn't prohibit secondary boycotts. But we would say, yep, we can't engage in a secondary boycott because the NLRA applies, the remedy might not be under the TLRO in that case. But the NLRA applies and we can't engage in a secondary boycott. Every other provision that is in dispute between the union, that provision is not in dispute between the union and the tribe here, it's not an issue. But every provision that's in dispute here between the union and the tribe and that the tribe has identified in its brief, reflect areas where unions and employers have a right to contract either around the NLRA's procedures or sort of contract about what will happen in the absence of any NLRA. And we have an obligation as a court, I believe, to harmonize different federal statutes, do we not? That's exactly right, Your Honor. And is there anything that you can point to in this situation, where there are in siloable differences between the NLRA and the TLRO in this case that was enacted as a result of the compact issue? No, there's nothing irreconcilable. And I would say it's actually consistent if you include section 301. Right. I'll just make one last point as to why there is no preemption here. The TLRO is a union. The tribe doesn't have jurisdiction over the union. The tribe can't force the union into this contract. It's an offer to contract, which again, Judge Rodford, we would say the tribe, by virtue of adopting the TLRO, is accepted if that offer is made by the union. And contracts and offers to contracts are never preempted. They might violate. You could have a provision of that contract that might violate a law, but the contract itself is not preempted. So again, that just brings us back to Buckeye check cashing. So we would ask the court to affirm the order compelling arbitration. And for the reasons stated by the district court, to also affirm the dismissal of the declaratory relief claim and that the district court didn't abuse its discretion in following Buckeye check cashing. Thank you. Very well. Any other questions of counsel by either of my colleagues? Very well. Mr. Biddle, you have some rebuttal time. Thank you very much, Your Honor. To go to your last question, Judge Smith, I thought it was an interesting question. Is there, you know, isn't it the court's responsibility to try to harmonize competing federal laws? And you pointed to the TLRO as one of those federal laws. The TLRO is really not a federal law. So the TLRO came from IGRA, Indian Gaming Regulatory Act, which allows Indian tribes to operate casino gaming with the permission of the Department of Interior. Right. The Department of Interior has to approve the compact. In 2015, the Department of Interior approved the gaming contract that's currently active between the Siquan tribe and the state of California. That was before the Casino Palma decision. And that was before there was any decision in the Ninth Circuit that said that the National Relations Act applies to Indian tribes in California that do casino gaming. We now know, and as counsel for the union stated and agrees with me, that the NLRA does apply to tribal employers. And, you know, the caveat with the Department of Interior accepting a compact and they current law. And when that current law changes, then there's a question as to whether and to what extent the tribe should continue to enforce their TLRO in this case. Let me ask you this, as I ask counsel for the union, what provision of the NLRA do you believe is in conflict with, in this case, the TLRO? Well, there's there's several provisions. One is in the TLRO. It states that the tribe has to. And this is again, the TLRO was sort of forced on the tribe by the state as it has to other other tribes as well. Compacts work. That's right. That's right. So, number one, giving the contact employee contact information, personal information, private information to the tribe, to the union before there's a showing of the union would say, well, that's that's a 301 negotiating position. What's your response to that? No, there's there's because there's no agreement or there's a question as to whether there's an agreement between the union and the tribe. 301 doesn't apply. 301 only applies to agreements. And so 301 typically applies when there's a collective bargaining agreement between the parties and one of the parties goes to court to try to enforce that. So that's typically where we don't have a collective bargaining agreement here. We have this purported agreement. That's the TLRO that we're saying was never formed. OK, number two, your time is up. So let me ask my colleagues whether either of them have additional questions. I do. I have one one question for and you probably know what it is, counsel. So your opponent says you can't have it both ways. You're either in breach of your contact between the tribe and the state or you basically agreed to this contract with the union. So which which is it? We are just asking the court to tell us, do we have to apply? Do we have to comply with provisions that are employee protected provisions of the National Labor Relations Act or do we comply with the different provisions? That's definitely not the question I posed. OK, I'm talking about contract formation. Sure. OK, it seems to me either you have formed a contract with the union by virtue of just signing up to the TLRO or you have reserved the right to basically refuse to accept an offer. But if you do that, you are definitely in breach of the agreement you made with the state. And I'm asking you, which of those two scenarios are you committing? Because it's got to be one or the other. Well, we did not we do not believe that there was a contract formed because although the offer was made by the union, the tribe did not accept it very clearly. Therefore, the tribe is therefore in breach of its agreement with the state. Correct? No, we don't believe we're in a breach of agreement with the state because we are maintaining the TLRO, haven't done anything to change the compact. We aren't in breach of the compact in any way whatsoever. The state hasn't said we are. So the state's argument that we have to arbitrate with the state and meet and confer on all those kinds of things really doesn't come up because we haven't done anything to breach the contract yet. OK, thank you. Other questions by my colleague? Well, thanks to both counsel for your argument in this interesting case. The case just argued is submitted and the court stands adjourned for the day. Thank you.
judges: TASHIMA, SMITH, WATFORD